[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION CT Page 5484
After a trial of this action the court finds that on November 1, 1989 the plaintiff Bristol Savings Bank (the "Bank") and the defendants John J. Cellino and Kathy M. Cellino executed a letter agreement in which the Bank provided the Cellinos with a commercial revolving line of credit in an amount not to exceed $525,000 (hereinafter referred to as the "Commitment letter"). On that date the defendants also executed a promissory note to the Bank in the original principal amount of $525,000. To secure the promissory note the defendant Kathy M. Cellino executed a mortgage deed to the Bank on property located at 440 Deercliff Road, Avon, Connecticut. The promissory note provided that the principal balance was payable on demand and that interest on the unpaid balance was payable at a variable rate based on the Bank's prime rate plus 1.5%.
The Commitment letter provided that the line of credit to be provided to the Cellinos would expire on November 1, 1990 unless it was extended by the Bank at its sole discretion. It further provided that while any sums were owed to the Bank thereunder the defendants agreed to provide annual financial statements to the Bank.
Certain internal documents of the Bank provided that the purpose of the loan evidenced by the promissory note was to construct an addition to an existing house and the source of repayment of the loan would be personal income and a permanent mortgage.
The Commitment letter does not contain any language concerning the conversion of the existing loan to any other type of loan.
Prior to November 1989, John Cellino had received various loans from the Bank. He estimated that the total amount of those loans was $2.5 million. Although he had never executed any formal loan applications in connection with those loans, he had always submitted financial statements.
John Cellino and John Driscoll, a vice president of the Bank, had been friends for a number of years prior to CT Page 5485 1989. Prior to executing the promissory note Cellino discussed with Driscoll that he needed the $525,000 line of credit in order to finish renovation of and additions to his residence at 440 Deercliff Road in Avon. Driscoll told Cellino that when construction of the residence was finished the Bank would convert the loan evidenced by the promissory note into a permanent mortgage loan. Cellino and Driscoll did not discuss the terms of the permanent mortgage loan.
In late spring of 1990, John Cellino approached John Driscoll for an additional $50,000 loan. Thereafter, Driscoll prepared several loan proposals which sought to convert the existing $525,000 loan to a term note and mortgage and increase the principal amount of the loan by $50,000 to $575,000. All of these proposals were denied by the Bank. Driscoll informed Cellino that they were denied because Cellino would not provide the Bank with a current financial statement. The Bank required the financial statement to insure that Cellino had sufficient income with which to make the loan payments. The Bank also required Cellino's financial statement because it suspected that Cellino might not have sufficient income for loan payments. Cellino, who was in the real estate development business, had informed Driscoll that his financial circumstances had changed for the worse between November 1, 1989 and June of 1990.
John Cellino testified that in the early fall of 1990 he discussed the need for updated financial statements with John Driscoll. Cellino told Driscoll that due to the financial difficulties he was experiencing, providing financial statements to the Bank would cause "massive complications".
By letter dated October 23, 1990 John Driscoll informed the Cellinos that the Bank needed to receive an updated financial statement from them and that the last statement the Bank had on file was dated September 7, 1989. John Cellino failed to produce any financial statement either in connection with proposals for the $575,000 permanent mortgage or in response to the aforementioned letter. By letter dated January 14, 1991 Driscoll again wrote to the Cellinos and indicated that further delay in providing a financial statement constituted a default under the current note and mortgage. CT Page 5486
In late February 1991 the Bank granted an extension of the Cellinos' commercial line of credit until May 9, 1991 to give the Bank and Cellino time to negotiate the conversion of the construction mortgage and note into a permanent mortgage and note. As of the date of the extension the Cellinos were current in their interest payments under the promissory note. However, the Cellinos made no further interest payments after February 1991. Cellino testified that although he had the money to make the interest payments, he became "frustrated" with the situation at the Bank and, therefore, stopped further interest payments.
In June of 1991 the Bank made a written demand on the Cellinos for full payment of the principal and interest due under the promissory note due to Cellinos' failure to pay interest due on March 1, 1991 and thereafter.
The Cellinos have filed two special defenses to the complaint for foreclosure. The first special defense alleges that the plaintiff committed to convert the loan evidenced by the promissory note into a conventional term mortgage and reneged on that commitment and that the plaintiff committed to provide additional funding to the defendants in the amount of $50,000, which they also failed and neglected to do. The Cellinos allege that the failure to convert the conventional term mortgage and to provide an additional $50,000 in funding "artificially caused the alleged breach" of the terms of the promissory note.
The first special defense does not address the making, validity, or enforcement of the promissory note and mortgage which are the subject of the complaint. The promissory note contains no agreement by the Bank to convert the promissory note, which is by its terms payable on demand, into a permanent mortgage note. The first special defense alleges nonperformance and breach of a separate agreement between the parties.
Connecticut has recognized the following special defenses to an action for foreclosure: payment, discharge, release or satisfaction, Connecticut Savings Bank v. Reilly, et al, 12 Conn. Sup. 327 (1944); accident, mistake or fraud, Boretz v. Segor, 124 Conn. 320, 199 A. 548 (1938); unconscionability, Hamm v. Taylor, 180 Conn. 491, 290 A.2d 946
(1988); abandonment of security; Glotzer v. Keyes, 124 Conn. 227, CT Page 54875 A.2d 1 (1939); and usury, Atlas Realty Corp. v. House,120 Conn. 661, 183 A. 9 (1936).
Various superior courts have held that special defenses similar to those alleged by the defendant are inapplicable to mortgage foreclosure proceedings. In New England Savings Bank v. Highridge, Inc. et al, Conn. L. Rptr. No. 5, 110 (November 10, 1991) (Leuba, J.) the court held that the defense of "unclean hands" claiming that the Bank failed to comply with the terms of a loan modification agreement was inapplicable in a foreclosure action.
In City Trust v. Kings Gate Developers, Inc.,2 Conn. L. Rptr. No. 639 (1990, Lewis, J.) the court held that a claim that the Bank tortiously interfered with the contract to sell the mortgaged property at a price which would have satisfied the mortgage note was not a valid special defense to the mortgage foreclosure action.
The second special defense attempts to defeat the plaintiff's right to foreclose its mortgage by alleging that the Bank breached an implied covenant of good faith and fair dealing. "An implied covenant of good faith and fair dealing is `essentially . . . a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended'. . ."" Eis v. Meyer, 213 Conn. 29, 36566 A.2d 422 (1989). Absent an agreement between the parties, no duty of good faith can be implied to require performance of such agreement. Dacourt Group, Inc. v. Babcock Industries, Inc., 747 F. Sup. 157 (D. Conn. 1990). There is no provision in the promissory note, the mortgage or the Commitment letter between the Bank and the Cellinos which constitutes the Bank's agreement to convert the construction mortgage securing the promissory note to a permanent mortgage. The Bank did not violate the covenant of good faith and fair dealing by failing to convert the promissory note and mortgage to a permanent fixed term promissory note and mortgage.
The Cellinos have filed a counterclaim in two counts to the complaint. The first count alleges that the plaintiff breached its agreement to convert the construction funding into a conventional real estate mortgage. The second count alleges that the Cellinos relied upon the representation and assurances of the plaintiff in regard to the increased amount of the loan and the conversion of the loan to a regular CT Page 5488 mortgage and that the Bank's actions in failing to increase the amount of the loan and convert it to a permanent mortgage violated the Connecticut Unfair Trade Practices Act, Connecticut General Statutes 42-110a et seq. ("CUTPA")
The court finds that Driscoll told John Cellino that the Bank would convert the construction mortgage into a permanent mortgage. This statement was never reduced to writing and the parties never discussed the terms of the permanent mortgage. There was no evidence that anyone from the Bank ever agreed that the Bank would make an additional $50,000 loan to Cellino.
The oral agreement by John Driscoll to convert the construction loan to a permanent mortgage loan is not enforceable for two reasons. First, under the established principles of contract law, an agreement must be definite and certain as to its terms and requirements, Augeri v. C. F. Wooding Co., 173 Conn. 426, 429-30, 378 A.2d 538 (1977) A. Corbin, Contracts (1963) Section 95; One Restatement (Second), Contracts (1981), Section 33; D'Ulisse-Cupo v. Board of Directors of Notre Dame High School, 202 Conn. 206, 215,520 A.2d 217 (1987). The alleged agreement by the Bank to convert the construction loan to a permanent mortgage loan did not contain basic provisions such as the rate of interest, the term, or amount of time allowed for payment, or the amount of monthly payments.
The second reason that the alleged agreement by the plaintiff to grant a permanent mortgage loan to the defendants is unenforceable is that it was not in writing and, therefore, is not enforceable under Connecticut General Statutes 52-550(a), the statute of frauds, which provides, in part:
 [N]o civil action may be maintained in the following cases unless the agreement, or a memorandum of the agreement is made in writing and signed by the party or the agent of the party, to be charged: . . . (4) any agreement for the sale of real property or an interest in or concerning real property. . . .
A mortgage is the conveyance of legal title which CT Page 5489 must comply with the requirements of the statute of frauds. State v. Hahn, 207 Conn. 555, 562, 541 A.2d 499 (1988). The court could find no Connecticut law specifically providing that an agreement to grant a mortgage must be in writing to comply with the statute of frauds. However, it is clear that an agreement to convey title to the real property is within the statute of frauds. Breen v. Phelps, 186 Conn. 86, 92,439 A.2d 1066 (1982); Montanaro v. Pandolfini, 148 Conn. 153, 157,168 A.2d 550 (1961).
An agreement to modify a mortgage is within the statute of frauds, Brooks v. Benham, 70 Conn. 92, 97,38 A. 908 (1897). In Bradford Realty Corp. v. Beetz, 108 Conn. 26,30, 142 A. 395 (1928) the court stated that an oral agreement to provide a release of a mortgage would violate the statute of frauds.
In The Glastonbury Bank and Trust Comp. v. Corbett Construction Co., Inc. et al, 7 Conn. L. Rptr. No. 18 519 (November 30, 1992), (Walsh, J.) the court held that an oral agreement to forebear from foreclosing on a mortgage was subject to the statute of frauds. The court based its decision on the following cases from other jurisdictions: Atlantic Financial v. Orianna, 594 A.2d 356, 357 (Pa.Super. 1991); Gatts v. E.G.T.G., GMBH, 470 N.E.2d 425 (Ohio App. 1983) (discharge of mortgage involves an interest in land and is therefore required to be in writing under the statute of frauds); Casey v. Travelers Ins. Co., 585 So.2d 1361 (Ala. 1991) (release of mortgage is within statute of frauds); Hallaway Properties v. Bank of New York, 547 N.Y.S.2d 728
(A.D. 4 Dept. 1989), leave for appeal denied 557 N.Y.S.2d 309 (Ct.App. 1990) (release of mortgage must be in writing).
The court in Atlantic Financial v. Orianna, supra held that:
 The alleged oral agreement not to foreclose was between the mortgagor and the mortgagee. As between these parties, the mortgage represented an interest in land. The agreement not to foreclose was therefore an agreement to surrender an interest in land. As such, the agreement was within the statute of frauds.
CT Page 5490
The alleged agreement by the Bank to grant a permanent mortgage loan to the Cellinos was an agreement concerning an interest in land, that being the mortgage deed to be conveyed by the Cellinos to the Bank. Therefore, the agreement is within the statute of frauds and is not enforceable because it was not in writing.
The defendants' counterclaim also alleges that the plaintiff's failure to convert the construction loan into a permanent mortgage loan constituted an unfair trade practice within the meaning of the Connecticut Unfair Trade Practices Act, Connecticut General Statutes, 42-110a et seq. ("CUTPA").
Whether a Bank is subject to CUTPA has not been decided by our Supreme Court. There is a division of authority among superior court cases which have dealt with this issue. In Economic Development Associates v. City Trust,3 Conn. L. Rptr. 403 (1991) (Dranginis, J.) the court held that CUTPA did apply to a bank where the transaction involved a consumer-oriented activity. Other cases have held that CUTPA is not generally applicable to banks by virtue of various state and federal regulations to which banks are subject. Evervest, Inc. v. Advest Bank, 4 Conn. L. Rptr. 326, (1991) (Wagner, J.); Washington Trust Co. v. Alland Assoc.,3 Conn. L. Rptr. 447 (1991) (Leuba, J.); Bristol Savings v. Sattler, 4 CSCR 351 (1981) (Aronson, J.); Peoples' Bank v. Horesco, 1 CSCR 62 (1986). This court need not decide whether CUTPA applies to the plaintiff Bank in this situation because the court does not find that the Bank's conduct, when considered in light of all the circumstances, constitutes an unfair trade practice within the meaning of CUTPA.
John Cellino was a businessman and a certified public accountant, who had been involved in many real estate transactions. In several prior dealings with the Bank, he had been required to submit current financial statements to the Bank in order to obtain a loan. Cellino knew, or should have known, that when John Driscoll stated that the Bank would convert the construction loan to a permanent mortgage loan, this was not an unconditional commitment, but contained an implied condition that prior to making the loan, the Bank would have to satisfy itself, as it had done in the past, that Cellino had the ability to make payments on the permanent mortgage loan. CT Page 5491
The defendants have taken the position that the Bank's request for an updated financial statement prior to converting the construction loan to a permanent mortgage loan was unreasonable because the Bank already had Cellino's financial statement of September of 1989, and when the new statement was requested the prior financial statement was not even a year old. The evidence at trial was that the Bank's policy was to require a new financial statement prior to granting a new loan. The conversion of the construction loan to a permanent mortgage loan was, essentially, the granting of a new mortgage loan. Thus, the Bank's request for a new financial statement was not inconsistent with its existing policies. Moreover, John Cellino admitted to John Driscoll that he was having financial difficulties at the time he asked the Bank to grant him a permanent mortgage loan. Even absent any policy requiring financial statements from a borrower, when the Bank received information from Cellino that his financial condition was poor and had changed for the worse since the date of his prior financial statement, it was not unreasonable for the Bank to require Cellino to provide a new financial statement prior to granting a permanent mortgage loan.
John Cellino not only failed to provide the Bank with his financial statement, but stated to Mr. Driscoll that he would not do so. At that point the Bank could have demanded full payment of the original promissory note which was payable on demand. The Bank did not do so. Rather, it extended the period in which it agreed to forebear from making demand on the note in order to give the Cellinos time to reach some agreement with the Bank concerning the granting of a permanent mortgage loan. Mr. Driscoll testified that John Cellino informed him that Kathy Cellino had 98,000 in cash. Mr. Driscoll suggested that that cash be placed in escrow to insure a fund from which to make mortgage payments on the permanent mortgage. However, the Cellinos declined to follow this suggestion. There is no evidence that Driscoll ever declined to make a proposal to the Bank on behalf of the Cellinos with respect to the permanent mortgage loan. Therefore, it is not unreasonable to assume that negotiations between the parties would have continued during the period in which the Bank had agreed to extend the time for full payment of the construction promissory note. Rather than continue with those negotiations, John Cellino testified that he simply stopped making interest payments on the promissory note CT Page 5492 because he was "frustrated". The Bank only declared a default in the mortgage after the Cellinos stopped making payments due under the promissory note. The foregoing conduct of the Bank did not constitute an unfair trade practice in light of all the circumstances. Moreover, even if it had constituted an unfair trade practice, the defendants must prove an ascertainable loss in order to recover under CUTPA.
The evidence as to loss consisted of John Cellino's statement that in November of 1989 he had good relationships with banks other than the plaintiff and would have obtained his construction financing from another bank if he had known that the plaintiff would not be willing to convert the construction loan to a permanent mortgage loan. Cellino further testified that in the fall of 1990 his financial condition had deteriorated and he was unable to obtain a permanent mortgage loan from other banks. He did not introduce any evidence that he attempted to obtain permanent financing from other banks. He did not introduce any evidence that in November, 1989 other banks would have been willing to give him a construction loan with what amounted to an unconditional agreement to convert that loan to a permanent mortgage loan. The Cellinos continued to live in the mortgaged premises from February of 1991 to the present time without making any payments to the Bank. Thus, it appears to the Court that the only party who sustained any damages in this case was the Bank.
For the foregoing reasons, the defendants have failed to sustain their burden of proof on their counterclaim. Judgment is rendered on the counterclaim in favor of the plaintiff.
Judgment of strict foreclosure may enter in favor of the plaintiff on the complaint. The court finds that the amount of the debt owed to the plaintiff is $630,342.71 as of May 26, 1993 which is comprised of $525,000 in principal and $105,342.71 in interest. The court awards the plaintiff attorneys' fees in the amount of $21,941.50, appraisal fees in the amount $1200 and title search fee in the amount of $150. First law day is set at August 9, 1993.
Aurigemma, J. CT Page 5493